IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 1:13-CR-489 (TJM) |
| | ) | |
| v. | ) | **GOVERNMENT'S MEMORANDUM** |
| | ) | **REGARDING REMAND** |
| **AHMED A. ALGAHAIM and** | ) | |
| **MOFADDAL M. MURSHED,** | ) | |
| | ) | |
| **Defendants.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files this memorandum of law addressing the Second Circuit's December 1, 2016 decision, *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016).

## INTRODUCTION

The Second Circuit affirmed the judgments of conviction and sentences for defendants Ahmed A. Algahaim ("Algahaim") and Mofaddal M. Murshed ("Murshed"), and made clear that it "[did] not rule that the sentences were imposed in error." *Id.* at 800. Notwithstanding this determination and its having affirmed the sentences, the Second Circuit remanded the matter to this Court to permit consideration of what the Second Circuit described as the "unusualness" of the method employed by the Sentencing Guidelines for determining the defendants' offense level. *Id.* The Court should not accept the Second Circuit's invitation, because:

1. The Second Circuit's remand does not require such consideration by this Court, it only permits it. If this Court has no policy disagreement with the loss table, or otherwise believes further consideration is not warranted, it need not resentence the defendants.

2. There is no reason for this Court to "consider" how the Sentencing Commission might have invented a different means of taking loss into account in sentencing of fraud cases, because the Court lacks authority to resentence the defendants anyway.

## BACKGROUND

Algahaim and Murshed were convicted after a jury trial of conspiring to present Supplemental Nutrition Assistance Benefits ("SNAP" benefits, formerly known as food stamp benefits) for payment, in violation of 18 U.S.C. § 371 and 7 U.S.C. § 2024(c), and of unlawfully obtaining those benefits, in violation of 7 U.S.C. § 2024(b).

### A. Presentence Investigation Reports

The respective defendant's base offense level under the guidelines was determined to be six in accordance with U.S.S.G §2B1.1(a)(2). (Dkt. No. 156, Algahaim PSR, ¶ 27; Dkt. No. 141, Murshed PSR, ¶ 28). Each defendant's offense level then was increased based upon the amount of loss attributable to that defendant, in accordance with the loss amount table in U.S.S.G. §2B1.1(f). Algahaim received a 10-level increase based upon a loss amount of $130,612. (Algahaim PSR, ¶ 35). Murshed received a 12-level increase based upon a loss amount of $340,509. (Murshed PSR, ¶ 29).[1]

Both defendants had a criminal history category of I. (Algahaim PSR, ¶ 44; Murshed PSR, ¶ 41). With a total offense level of 16 and a criminal history category of I, Algahaim's advisory imprisonment range was 21 to 27 months. (Algahaim PSR, ¶ 56). With a total offense

---

[1] During the investigation, cooperating individuals engaged Algahaim, Murshed, and two other co-conspirators store clerks in fraudulent SNAP transactions. However, the loss amounts were not calculated on the basis of those transactions. Rather, they were based upon an analysis of the books and records of D&D Grocery, where the defendants worked. Those books and records reflected, among other things, the fraudulent transactions of more than 80 SNAP beneficiaries who were interviewed and admitted to selling their SNAP benefits for cash at D&D. (*See* Algahaim PSR, ¶¶ 14-15, 21-23; Murshed PSR, ¶¶ 13-14, 20-22).

level of 18 and a criminal history category of I, Murshed's advisory imprisonment range was 27 to 33 months. (Murshed PSR, ¶ 54).

### B. Sentencings

At Algahaim's sentencing, counsel for Algahaim said that "loss amount" was not a proper gauge of Algahaim's culpability. Counsel urged the Court to arrive at a sentence "that's removed from the loss computation." *Id.* When imposing sentence, the Court said:

> The Court finds, after looking at everything that I've mentioned, that the total offense level is a 16, criminal history category is a 1, the guideline range is 21 to 27 months. *The Court realizes the Guidelines are not mandatory, but are only something to guide the Court in sentencing, as well as all the other factors the Court has to consider.* So, upon the finding of guilty on Counts 1 and 4 of the superseding indictment, it's the judgment of this Court that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 21 months on each count, to run concurrently with each other.

Algahaim Sentencing Transcript, at pp. 15-16, attached hereto as Exhibit 1 (emphasis added). The Court imposed a within-guidelines sentence of 21 months.[2]

At Murshed's sentencing, the Court said that it considered Murshed's criminal conduct to be "very serious," and considered the amount of money involved in the offense to be "very substantial," further enhancing the seriousness of the offense. Murshed Sentencing Transcript, at p. 12, attached hereto as Exhibit 2. After noting that it had considered the sentencing memoranda, the Sentencing Guidelines manual, and the § 3553(a) factors, the Court imposed a within-guidelines sentence of thirty months. *Id.* at pp. 12-13.

---

[2] Algahaim has served his entire term of imprisonment. As a result, the issue raised by the Second Circuit is moot as to Algahaim, because nothing in the court's decision impacts the need for, or propriety of, the term of supervised release that the Court imposed.

## C. Appeal

On appeal, in relevant measure, Algahaim and Murshed challenged the substantive reasonableness of their respective sentences. Despite affirming the sentences, in addressing these claims, the Second Circuit said that the effect of the loss-amount adjustment to the defendant's guidelines offense levels "warrant[ed] further consideration." *Algahaim*, 842 F.3d at 800. After noting that Algahaim's offense level had been increased from six to sixteen and that Murshed's offense level had been increased from six to eighteen, *id.*, the court "recognize[d] that these increases complied with the Guidelines manual" and "that the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses." *Id.*

The court then opined that the "Commission could have approached monetary offenses quite differently." *Id.* And, the court described one alternative method that the Commission could have provided to determine a defendant's offense level for a monetary offense. *Id.* The court explained that this possible alternative method would start with a "base offense level that realistically reflected the seriousness of a typical fraud offense," *id.*, and would permit "adjustments up or down to reflect especially large or small amounts of loss." *Id.*

The court described the methodology utilized in the Guidelines Manual as "unknown to other sentencing systems," *id.*, and the "unusualness" of the methodology as "a circumstance that a sentencing court is entitled to consider." *Id.* The court added that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

Finally, the court made clear it was *not* ruling that sentences imposed on Algahaim and Murshed were imposed in error. *Id*. The court said that it was remanding the case only "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id*. As a result, the court affirmed the defendants' convictions and sentences, but remanded for further consideration "as outlined in [the court's] opinion." *Id.*

**ARGUMENT**

I.  **The Second Circuit's Remand Does not Require Such Consideration by This Court, It Only Permits It. If This Court Has No Policy Disagreement With the Loss Table, or Otherwise Believes Further Consideration Is Not Warranted, It Need Not Resentence the Defendants.**

It was for this Court to determine what weight to accord the applicable guidelines and the remaining 18 U.S.C. § 3553(a) factors. Nothing in the record suggests that the Court did not understand its discretion to impose a sentence outside of the applicable guidelines range, including based upon a policy disagreement with the U.S.S.G. §2B1.1 loss table or any other of the many guidelines sections that the Court applied in determining the advisory imprisonment range.[3]

It is well-established that a district court may vary from the advisory guideline range based upon a policy disagreement with the guidelines or based upon the court's assessment of the factors in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The Second Circuit's remand order is inconsistent with well-established Second Circuit authority by which a district court is not required to discuss at sentencing any particular sentencing factor in order to fulfill its duty to consider the sentencing factors in 18 U.S.C. § 3553(a). *See, e.g., United States*

---

[3] U.S.S.G. §2B1.1 itself provides authority for a district court to depart downward if the offense level resulting from the loss table enhancement and any other §2B1.1 enhancements, substantially understates or overstates the seriousness of the offense. *See* U.S.S.G. §2B1.1, comment n. 20(A) and (C).

5

*v. Pattee*, 820 F.3d 496, 512 (2d Cir.), *cert. denied*, 137 S. Ct. 222 (2016) ("A sentencing court does not have to parse every sentencing factor under § 3553(a), or address each of the defendant's arguments regarding various factors, for a sentence to be procedurally reasonable."). Indeed, the Second Circuit has concluded that "[i]n the absence of record evidence suggesting otherwise, we presume that a sentencing judge has considered the relevant statutory factors." *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). And, "[a] judge need not utter 'robotic incantations' repeating each factor that motivates a sentence." *United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013) (citation omitted).

The concern that the Second Circuit identified – whether described as the "unusualness" of the approach taken in the guidelines' loss table in U.S.S.G. §2B1,1 or "the significant effect of the loss enhancement, in relation to the low base offense level" – is a permissible sentencing consideration only if it is subsumed within one or more of the § 3553(a) sentencing factors. When sentencing both Algahaim and Murshed, this Court explained that it had considered the applicable sentencing factors. At the time of sentencing, Algahaim argued that the loss-amount was not a proper gauge of his culpability and urged the Court to impose a sentence "removed" from the loss computation. Before imposing sentence, the Court recognized that the guidelines "are only something to guide the Court in sentencing." Ex. 1, Algahaim Sentencing Transcript, at pp. 15-16. Similarly, at the time it sentenced Murshed, the Court made clear that it had considered "the sentencing memoranda, the Sentencing Guidelines manual, and the § 3553(a) factors" before imposing sentence. Ex. 2, Murshed Sentencing Transcript, at pp. 12-13.

The record reflects that this Court was fully aware at the time of sentencing that it had authority to impose a sentence outside the Sentencing Guidelines range based upon a policy disagreement, including a disagreement with the offense level increase resulting from the U.S.S.G.

§2B1.1 loss table, pursuant to 18 U.S.C. § 3553(a). The Court consciously opted not to do so. And for good reason. The terms of imprisonment imposed by the Court were necessary in order to deter the defendant and others from committing similar offenses, to address the seriousness of the defendant's crimes, and to comply with the sentencing purposes set forth in Section 3553.

The defendants and their co-conspirators engaged in scheme to trade SNAP benefits for cash, cigarettes, and other ineligible items. Algahaim was personally accountable for a loss of $130,612. (Algahaim PSR at ¶ 31). Murshed was personally accountable for a loss of $340,509. (Murshed PSR at ¶ 29). These loss amounts were based upon an analysis of the books and records of D&D Grocery, and reflected, among other things, the fraudulent transactions of more than 80 SNAP beneficiaries who were interviewed and admitted to selling their SNAP benefits for cash at D&D. (*See* Algahaim PSR, ¶¶ 14-15, 21-23; Murshed PSR, ¶¶ 13-14, 20-22).

The defendants' exchange of benefits at a rate of approximately 50 cents on the dollar was simple and profitable. They and their co-conspirators were conscious of the fact that excessively high transactions would risk revealing their scheme to SNAP administrators. So they devised ways to avoid drawing attention to D&D Grocery, including by generally keeping transactions below $100, and by using uneven dollar transaction amounts. The defendants personally debited beneficiaries' EBT cards at D&D Grocery in exchange for cash on many ocassions, and were also present when their co-conspirators did so.

To engage in the largest transactions without garnering unwanted attention, typically in order to completely drain beneficiaries' EBT cards of hundreds of dollars at once, the defendants had their co-conspirators use the beneficiaries' cards at other, larger stores. With the defendants' encouragement, co-conspirators drove the beneficiaries to the stores or simply took the beneficiaries' EBT cards to other stores themselves. They used those cards to purchase and bring

7

merchandise back to D&D Grocery, again giving the beneficiaries approximately 50 cents on the dollar.

The defendant and his co-conspirators assisted a large number of food stamp beneficiaries in defrauding the SNAP program, thwarting the purpose of the program: to get food to the needy and their families. As described in the PSRs, more than 80 such beneficiaries admitted to engaging in the fraud at D&D. At oral argument before the Second Circuit, the panel asked questions about whether the length of time of the government's investigation increased the loss amount and whether it was fair to do this given that the government was conducting an undercover investigation. The government had indeed used cooperating individuals with food stamp benefit cards to provide the defendants with opportunities to commit food stamp fraud. (Algahaim PSR at ¶¶ 9, 10, 19, 20; Murshed PSR at ¶¶ 8, 9, 18, 19). The Court of Appeals may not have appreciated, however, that the loss amount here was not significantly affected by the undercover transactions and instead was largely driven by food stamp fraud involving non-cooperating SNAP beneficiaries engaging in non-controlled fraudulent transactions with the defendants and their co-conspirators. (Algahaim PSR at ¶¶ 21-23; Murshed PSR at ¶¶ 20-22).

In addition to the substantial loss to the government, the defendants inflicted significant damage to the community by operating their SNAP-benefits-to-cash exchange business. For their own profit, the defendants and their co-conspirators turned the SNAP program from one that funded the purchase of food for poor families into a means for already vulnerable families to use welfare benefits to purchase ineligible items, including controlled substances. As D&D Grocery became known in the community as a place to exchange food stamps for cash, drug dealers set up shop outside the store's entrance and, as the Court may recall from a video exhibit played during the defendants' trial, at least one drug dealer did business inside D&D, offering to sell controlled

8

substances to customers who were entering the store to exchange food stamps.[4] The sentences imposed by this Court were necessary to provide a specific deterrent to the defendants and a general deterrent to other store owners and employees who might engage in this simple, profitable, and destructive scheme.

Finally, it bears mention that, notwithstanding the concern expressed by the Second Circuit, a criminal sentencing system that uses loss amount from a fraud scheme as a rough proxy for culpability, dangerousness, or harm is hardly "unusual." *Algahaim*, 842 F.3d at 800. Indeed, many jurisdictions, including New York State, break up larceny and similar offenses into different degrees, with corresponding penalties, based purely upon the amount stolen.

Nor is it novel for a guidelines system to link specified loss amounts to sentencing increases. The alternative that the Second Circuit posited – a guideline that begins with "a base level that realistically reflect[s] the seriousness of a typical fraud offense and then permit[s] adjustments up or down to reflect especially large or small amounts of loss," *id.*, – does all of these things and is functionally identical to the approach in U.S.S.G. §2B1.1. It makes no difference whether the starting point is a mid-range base offense level linked to a mid-range loss amount, which can be increased or reduced, or a lower base offense level, linked to a minimum loss amount, which can only increase.

Indeed, it is likely that the Second Circuit preferred approach would not only work the same as U.S.S.G. §2B1.1(b), but also would yield the same or a similar outcome. According to Sentencing Commission data, the median loss amount in cases involving §2B1.1 was $118,081 in

---

[4] A full appreciation of the damage that the defendants' scheme caused to the community is not readily apparent from the sterile record available to the Second Circuit. Among other things, it is unlikely that the Second Circuit panel was able to review the evidence, particularly the video recordings, with a degree of thoroughness comparable to this Court's observation during trial.

fiscal year 2014, and $130,301 in fiscal year 2015.[5] The Sentencing Commission, under the approach that the Second Circuit posited, thus reasonably could decide that a "typical fraud offense" is one causing a loss of $130,000. According to the same data set, "[t]he average sentence length for §2B1.1 offenders was 24 months." Twenty-four months is the mid-range sentence for an offense level of 16 if the offender has a criminal history category of I. Accordingly, the Commission reasonably could assign a "typical" sentence – one in the 21-to-27-month range applicable to offense level 16 and a criminal history category of I -- to such "typical fraud offenses." In terms of loss amount, offense level, and length of imprisonment, Algahaim's offense of conviction – which caused a loss of $130,000, was assigned an offense level of 16, and resulted in a twenty-one-month term of imprisonment -- was "typical." Murshed's offense of conviction – which caused a loss of $340,000, was assigned an offense level of 18, and resulted in thirty-month term of imprisonment -- appropriately reflected that Murshed was a member of the conspiracy from its inception until its end, held the bank account into which all the proceeds were deposited, and was personally responsible for causing a greater harm over a longer period of time.

> II. **There Is no Reason for This Court to "Consider" How the Sentencing Commission Might Have Invented a Different Means of Taking Loss Into Account in Sentencing of Fraud Cases, Because the Court Lacks Authority to Resentence the Defendants Anyway.**

This Court lacks authority to resentence the defendants because the Second Circuit's remand order invites the Court to reconsider its final judgment in circumstances that exceed this Court's jurisdiction.

It is well established that "[a] federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010)

---

[5] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY15.pdf

(quoting 18 U.S.C. § 3582(c)).[6]  It would be illegal for the district court to either resentence or modify a sentence under these circumstances.  To the extent that the Second Circuit's decision makes this outcome possible, it conflicts with a federal statute and a Supreme Court decision.

Respectfully submitted this 3rd day of April, 2017,

RICHARD S. HARTUNIAN
United States Attorney

*/s/ Jeffrey C. Coffman*_____

By:    Jeffrey C. Coffman
Assistant United States Attorney
Bar Roll No. 517969

---

[6] 18 U.S.C. § 3582(c) provides exceptions to this general proposition, but none of those exceptions are applicable here.  Fed. R. Crim. P. 35 also provides district courts with limited authority to modify a previously imposed sentence.  The circumstances under which that authority may be exercised also are not present here.

**Certificate of Service**

I hereby certify that on April 3, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to:

>John B. Casey, Esq.
>Attorney for Defendant Mofaddal Murshed
>jcasey@dreyerboyajian.com
>
>Timothy E. Austin, Esq.
>Attorney for Defendant Ahmed Algahaim
>Tim_austin@fd.org

>*/s/ Jeffrey C. Coffman*
>Jeffrey C. Coffman